# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

PAUL A. JACKSON,                          )
                              Plaintiff,  )
                                          )
                    v.                    )          4:09-cv-120-SEB-WGH
                                          )
ALLSTATE INSURANCE COMPANY,               )
                                          )
                             Defendant.   )

## ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Defendant, Allstate Insurance Company ("Allstate"), filed this Motion for Summary Judgment as to Plaintiff's bad faith claim against it in connection with an insurance policy it had issued to Plaintiff. (Docket Nos. 26, 28, & 30). Plaintiff Paul A. Jackson ("Jackson") has filed a Brief in Opposition (Docket No. 31), and Defendant has filed a Brief in Reply (Docket No. 35). This dispute centers on Allstate's handling of an underinsured motorist claim submitted to it by its insured, Jackson. We now address and resolve the pending motion.

## I. Summary Judgment Rules

Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. <u>See id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u>, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. <u>Id.</u> at 325; <u>Doe v. R.R. Donnelley & Sons, Co.</u>, 42 F.3d 439, 443 (7th Cir. 1994).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994). The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion. <u>Anderson</u>, 477 U.S. at 247-52. Therefore, after

drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

## II.  Findings of Material Facts

The following factual findings reflect the evidence in a light most favorable to Plaintiff as required of the court in ruling on Summary Judgment.

1.  Allstate issued a policy of automobile insurance to Paul A. Jackson, a resident of Clark County, Indiana, under policy number 002283046 (the "Policy"), which was in full force and effect on January 13, 2001. The Policy contained, among other things:  (a) Medical Payments ("Med Pay") coverage with applicable limits of $5000, and (b) Uninsured[1] Motorists Bodily Injury coverage with applicable limits of $100,000 per person. (Complaint ¶ 11 & Ex. 1; Affidavit of Mariana Hugill [hereinafter "Hugill Aff."] ¶ 4). The Policy provides, in pertinent part, that Plaintiff is entitled to recover "damages which [Jackson] is legally entitled to recover from the owner or operator of an uninsured auto . . . ." (Policy p. 11)

---

[1]The Policy uses the term "Uninsured Auto" to include "underinsured motor vehicle." (*See* definition of "Uninsured Auto" in the Policy at page 12).

2. On January 13, 2001, Jackson was involved in a motor vehicle collision with a vehicle driven by Phyllis J. Martin ("Martin") on Highway 135 near the intersection of Federal Drive, in Harrison County, Indiana (the "Collision"). (Complaint ¶¶ 5-7).

3. At the time of the Collision, Martin was insured by Illinois Farmers Insurance Company ("Illinois Farmers") under a policy of automobile liability insurance with limits of $50,000 per person. (Complaint ¶ 14).

4. The Harrison County Police Department responded to and investigated the Collision, on the basis of which an Indiana Officer's Standard Crash Report No. A010092 (the "Crash Report") was issued. Allstate received a copy of the Crash Report on or about January 19, 2001. The narrative portion of the Crash Report recited that all occupants of both the Martin vehicle and the Jackson vehicle "claimed to have no injuries." (Hugill Aff. Ex. A1).

5. A day earlier, January 18, 2001, Allstate received its first notice of the Collision and on that same day opened claim number 1567284292. (Hugill Aff. Ex. A2).

6. On January 19, 2001, Allstate adjuster Connie Daniels obtained a recorded statement from Jackson regarding the Collision. (Hugill Aff. Ex. A3).

7. Between January 22, 2001, and May 11, 2001, Jackson communicated by telephone with Allstate Med Pay adjuster Marilyn Kozlowski ("Kozlowski") regarding his treatment and payment of bills under the Med Pay coverage of his Allstate Policy. During a conversation on January 22, 2001, Jackson informed Kozlowski that he was being treated by a chiropractor, Dr. Morrison, for a

"sore neck" which had resulted from the Collision and further that he had been treated by Dr. Morrison "several months ago for headaches."  (Hugill Aff. Ex A4).

8.  On June 13, 2001, Jackson again telephoned Kozlowski to inform her that he had been released from chiropractic treatment and that his final visit was May 18, 2001.  Jackson further informed Kozlowski that he had been having headaches, but he was not sure whether they were related to the Collision or due to his history of migraine headaches before the Collision.  (Hugill Aff. Ex. A5).

9.  Between February 8, 2001, and April 1, 2002, Allstate paid, on behalf of Jackson, various medical providers a total of $4,984.66 under the Med Pay coverage of the Allstate Policy. Thereafter, no additional bills were submitted to Allstate by Jackson for payment under his Policy. (Complaint ¶ 15; Hugill Aff. Ex. A6).

10.  In December 2002, Jackson filed suit in Harrison County, Indiana, against Martin under state court cause number 31C01-0212-CT-62 (the "Harrison County Litigation").  (Complaint ¶ 13).

11.  Allstate was not made a party to the Harrison County Litigation.  (Complaint, Ex. 3, Release).

12.  Not until January 2007 did Jackson's attorney, Harry O'Donnell ("O'Donnell"), contact Allstate to inform Allstate that he represented Jackson in the state court litigation.  (Hugill Aff. Ex. A7).

13.  O'Donnell followed up that call with a letter dated February 7, 2007, requesting a copy of the "dec. page" of Jackson's Allstate Policy, which O'Donnell described as necessary in order "to determine the extent of any underinsured motorist coverage" that Jackson may have had.  Based on this notice to Allstate of O'Donnell's representation of Jackson with regard to a potential Uninsured Motorists ("UIM") claim, Allstate opened another file and assigned the UIM claim to adjuster Lesa Perez ("Perez").  (Hugill Aff. Ex. A8).

14.  On February 13, 2007, Perez telephoned O'Donnell's office, which she noted in the file was "closed today."  Perez left O'Donnell a detailed phone message inquiring concerning Martin's policy limits with Illinois Farmers, whether Illinois Farmers had accepted liability for the Collision, and whether O'Donnell could provide copies of the Complaint filed in the Harrison County Litigation and any settlement offers made to Jackson by Illinois Farmers.  (Hugill Aff. Ex. A9).

15.  On February 14, 2007, Allstate processor Louisa V. Magallanez ("Magallanez"), who had been assigned to assist Perez, telephoned O'Donnell's office and left a voice mail message introducing herself and providing her direct dial telephone number and the claim number.  Magallanez also sent a letter of acknowledgment with a medical and wage authorization to O'Donnell.  (Hugill Aff. Ex. A10).

16.  On February 14, 2007, Perez spoke by telephone with O'Donnell.  O'Donnell informed Perez that he would send her a "complete package" regarding Jackson's UIM claim.  Perez noted that during this discussion O'Donnell informed her that Jackson's claim involved the "exacerbation of pre-exst [sic] migraine headache issue" and that Jackson "also had [a] subsequent fall that is a med-mal case."  (Hugill Aff. Ex. A10).

17.  In response to O'Donnell's February 7th request for a copy of the Declarations pages of Jackson's Policy, Allstate obtained and, on March 5, 2007, mailed to O'Donnell a certified copy of the Declarations pages of Jackson's Policy in effect as of January 13, 2001.  (Hugill Aff. Ex. A11).

18.  By letter dated March 16, 2007, Perez notified O'Donnell that Allstate consented to Jackson's acceptance of Illinois Farmer's offer of Martin's $50,000 policy limits and that Allstate agreed to waive its Med Pay subrogation lien in the amount of $4,984.66.  (Hugill Aff. Ex. A12).

19.  On March 30, 2007, Magallanez telephoned O'Donnell's office and left a voice mail message inquiring as to the status of the demand package for Jackson's UIM claim and for an estimate of claimed medical expenses.  Magallanez made a note to the file to follow up with O'Donnell on May 9, 2007.  (Hugill Aff. Ex. A13).

20.  On May 9, 2007, Magallanez telephoned O'Donnell's office and again left a voice mail message inquiring as to the status of the demand package for Jackson's UIM claim, an estimate of the claimed medical expenses, and the status of Jackson's signed medical record release authorization.  (Hugill Aff. Ex. A13).

21.  On May 9, 2007, O'Donnell returned Magallanez's telephone call informing Magallanez that he was in the process of completing the demand package for Jackson's UIM claim. O'Donnell further informed Magallanez that Jackson would be agreeable to executing a medical record release authorization and that Jackson was not making a wage loss claim.  O'Donnell thanked Magallanez for her assistance.  Magallanez made a note to follow up with O'Donnell on June 8, 2007.  (Hugill Aff. Ex. A13).

22.  On June 7, 2007, Magallanez telephoned O'Donnell's office and left a voice mail message inquiring as to the status of the demand package for Jackson's UIM claim and an estimate of the claimed medical expenses.  Magallanez also inquired as to the status of Jackson's medical record release authorization and whether O'Donnell had completed the list of the names of all of Jackson's medical providers.  (Hugill Aff. Ex. A14).

23.  Later on June 7, 2007, Magallanez again telephoned O'Donnell's office, this time speaking directly with O'Donnell who informed her that he was in the process of finalizing Jackson's UIM claim demand and that he expected to submit it to Allstate within the next three to four weeks.  Magallanez again entered a note to the file to follow up with O'Donnell on July 9, 2007.  (Hugill Aff. Ex. A14).

24 .  By letter dated June 27, 2007, O'Donnell presented a demand to Allstate via Perez, which included a compilation of Jackson's medical records. (Complaint ¶ 18).

25.  On July 27, 2007, Perez telephoned O'Donnell's office to discuss Jackson's claim. After connecting with voice mail, she left a message for O'Donnell asking that he call her back. (Hugill Aff. Ex. A14).

26.  After reviewing O'Donnell's submitted materials, Perez noted that Jackson had what appeared to be a prior and longstanding history of headaches and substantial claims for  medical expenses for diagnostics relating to his continual migraine headaches.  Perez made a note to obtain Jackson's prior medical records via medical record release authorizations and a third party med-trace.  (Hugill Aff. Ex. A14).

27.  On August 1, 2007, Perez determined that Jackson's demand package did not appear to contain medical bills for claims related to the Collision.  (Hugill Aff. Ex. A15).

28.  On August 10, 2007, Perez ordered a med-trace and sent medical records requests regarding Jackson's medical records and bills to several identified providers, including Norton Immediate Care, Clark Memorial Hospital, Floyd Memorial Hospital, St. Catherine Hospital, St. Mary Elizabeth Hospital, Baptist East Healthcare, Jewish Hospital, Norton Hospital, the University of Louisville Hospital, and the Eye Care Institute.  (Hugill Aff. Ex. A15).

29.  On August 17, 2007, Perez telephoned O'Donnell to discuss Jackson's claim, connecting again only with voice mail, left a message asking O'Donnell to call her back.  (Hugill Aff. Ex. A14).

30.  A letter dated August 17, 2007, sent by from Perez to O'Donnell states, in pertinent part:

> I am in receipt and thank you for yours of 08/15/07.  I called your office on 07/27/07 and again today so that we could discuss the status of Mr. Jackson's case.
>
> The records we received document numerous diagnostic tests and treatment for migraines.  These records also indicate a long standing [sic] history of headaches.  In order to properly evaluate, Mr. Jackson [sic] injuries arising from this loss we have ordered his prior medical records from those treating facilities that you provided and also from the following providers that he has treated with in the past. . . .  Of course, we will provide a complete copy of the records we receive to you as they come in. Once we have received them all and have had an opportunity to review, I will contact you regarding settlement.

(Hugill Aff. Ex. A16).

31.  On September 10, 2007, Magallanez faxed a medical record release authorization to O'Donnell to respond to the requirements of medical providers from whom she was attempting to procure Jackson's records who would not accept a record release document older than 60 days. (Hugill Aff. Exs. A17, A18).

32.  On September 19, 2007, O'Donnell faxed back to Magallanez the signed medical record release authorization, and Magallanez continued to request and secure Jackson's medical records.  (Hugill Aff. Ex. A19).

33.  On November 7, 2007, Magallanez telephoned O'Donnell to provide him with an update on the status of the numerous outstanding medical records requests.  O'Donnell informed Magallanez that he had no objection to the procedures Allstate was utilizing.  (Hugill Aff. Ex. A20).

34.  On December 27, 2007, Jackson telephoned Allstate directly to inquire as to the status of his claim.  Allstate employee Cindy Jackson informed Jackson that, since he was represented by attorney O'Donnell in this matter, she was authorized to communicate only with O'Donnell and not Jackson.  (Hugill Aff. Ex. A21).

35.  On December 27, 2007, Perez was informed of Jackson's direct contact with Allstate regarding the UIM claim, prompting her to telephone O'Donnell to advise him of that communication.  In response to O'Donnell's voice mail, she again left a detailed message, including a status report on the claim processing.  (Hugill Aff. Ex. A21).

36. On January 9, 2008, Magallanez took note of the fact that Allstate had still not received medical records and billing statements from Frazier Rehab, Dr. Berg, and St. Mary Elizabeth Hospital. Magallanez emailed O'Donnell about these outstanding medical records, noting that she intended to contact the providers directly. In mid-February 2008, Magallanez made note of the fact that she still had not received certain medical records and bills. (Hugill Aff. Ex. A21).

37. On February 29, 2008, Magallanez recorded that O'Donnell had forwarded various additional records and medical bills to Allstate. Magallanez contacted the medical providers from whom Allstate still had not received records and transmitted renewed requests for the records to these providers. Magallanez copied O'Donnell on these faxed requests and, upon receipt, also forwarded the hospital records to him. Her letter closes with the statement: "Please feel free to contact adjustor, [sic] Lesa Perez with any questions. I will prepare the file for her review, once complete information has been received." (Hugill Aff. Ex. A22).

38. On March 7, 2008, Perez instructed Magallanez to begin a review of Jackson's medical bills and records received to date, despite the fact that several providers still had not provided Allstate with the requested documentation. Perez recorded her intention to discuss this with O'Donnell. (Hugill Aff. Ex. A22).

39. On April 16, 2008, Perez received a letter from O'Donnell in which O'Donnell expressed displeasure over the delay in evaluating Jackson's UIM claim. Perez telephoned O'Donnell's office that same day at 4:16 p.m. to discuss the matter, but again received O'Donnell's voice mail. Perez left O'Donnell a detailed message and a request that O'Donnell return her call. (Hugill Aff. Ex. A22).

40. On April 16, 2008, Perez sent a letter to O'Donnell acknowledging receipt of O'Donnell's letter of April 14 (received by Perez on April 16). In her correspondence, Perez provided O'Donnell another status update on the still outstanding medical bills and records. (Hugill Aff. Exs. A22, A23).

41. On April 17, 2008, Perez telephoned O'Donnell's office and left another message regarding the outstanding medical bills and documentation from Jewish Hospital for care rendered to Jackson on June 9 and 10, 2001, and for all of Dr. Brennan's services. (Hugill Aff. Ex. A24).

42. By letter dated April 25, 2008, Magallanez forwarded copies of all of Jackson's medical records and bills to O'Donnell that Allstate had received up to that time. (Hugill Aff. Ex. A25).

43. On May 23, 2008, a note written by Magallanez in the file referenced information she had received from O'Donnell indicating his difficulties in deciphering which medical provider correlated with which bills and records among those she had previously provided to him. Magallanez noted that she had provided O'Donnell these materials as a "dissected package" form, meaning that the bills and records were arranged according to each medical provider. Her practice was to send to O'Donnell each of the records requests she had sent to each provider, in hopes that such approach would clarify the matter. Magallanez wrote a prompt to herself to follow up the next week with Perez on her return to the office regarding the best way to proceed. (Hugill Aff. Ex. A24).

44. On May 27, 2008, upon her return to the office, Perez received and reviewed a letter of O'Donnell's dated May 14, 2008. In response, Perez telephoned O'Donnell later that same day to

explain to him the medical bills and records that Magallanez had previously sent to him.  Perez also informed O'Donnell that she would undertake an evaluation of Jackson's UIM claim based on the materials they had received to date, if that was agreeable to O'Donnell.  O'Donnell informed Perez that he approved. (Hugill Aff. Ex. A24).

45.  On July 5, 2008, Perez conducted her evaluation of Jackson's submitted UIM claim based on materials Allstate had received to date, noting that they still had not been provided bills and records from Jewish Hospital and Dr. Brennan.  Perez noted Jackson's significant prior medical history, including a 1989 lumbar fracture requiring surgery, a 1991 spinal fusion, and a 1994 clavicectomy.  Perez also made note of the loss date of January 13, 2001, and subsequent traumatic injuries Jackson had incurred thereafter in both November 2001 and November 2004.  Perez determined that Jackson had not sought medical attention on the date of the loss or at the loss scene; not until the next day did he complain of unspecified neck pain.  Jackson had not hit his head or lost consciousness as a result of the Collision.  Jackson had received only chiropractic treatment through May 2001 when he was released from treatment apparently pain free.  Jackson's treatment for headaches began after his release by the chiropractor.  Further, the medical records indicated that he had a prior history of headaches, extending over at least fifteen years.  With respect to Jackson's claimed exacerbation of a prior neck injury, Perez noted that Jackson's medical records contained information relating to pre-existing and severe degenerative disc disease.  In fact, none of Jackson's medical providers causally related his C4-5 anterior discectomy and plate and graft to the Collision.  Jackson's surgeon specifically noted, prior to the discectomy, that there was no connection between Jackson's claimed neck pain and his complaints of headaches.  Perez further determined that Jackson had received $50,000 from Martin's insurer as compensation for his

injuries and that Allstate had paid him approximately $5,000 under its Med Pay coverage. Perez concluded based on her review that the $55,000 payout to Jackson adequately compensated him for his injuries arising from the Collision, and she forwarded that evaluation and the file to her Evaluation Consultant. (Hugill Aff. Ex. A26).

46. On July 14, 2008, Perez telephoned O'Donnell to discuss her evaluation of Jackson's UIM claim. Having again received his voice mail, she left him another message. Perez followed up that same day with a letter to O'Donnell, which stated as follows:

> I called and left you a message today to discuss our evaluation of Mr. Jackson's UIM claim. After careful review and consideration, it is our opinion that Mr. Jackson has been fairly compensated for the injuries sustained in this accident by the $55,000.00 he has already received.

> As you know, we have had a very difficult time getting Mr. Jackson's prior records and there are several records and dates of service missing. However, as I promised, I did evaluate using the information provided to date. Should you have any documentation that we have not considered I would be glad to again review.

(Hugill Aff. Ex. A27)

47. On July 17, 2008, Perez received a letter from O'Donnell dated July 15, 2008, wherein O'Donnell: (i) acknowledged receiving Perez's voice mail message of July 14, (ii) stated that he would no longer speak with Perez by telephone, and (iii) demanded a written followup to Perez's letter of July 14. (Hugill Aff. Exs. A26, A28).

48. On August 1, 2008, Perez prepared and mailed a letter to O'Donnell wherein she elaborating on her reasoning and her evaluation of Jackson's submitted UIM claim. She included a

chronology of Jackson's medical treatment, including treatments she believed not to be causally related to the Collision. In substance, her letter provided, in pertinent part, as follows:

> In response to your request of 07/15/08, I enclose my complete chronology of Mr. Jackson's medical records. Let me remind you that we completed the evaluaiton [sic] at your request without the complete records from Jewish Hospital and Dr. Brennan.
>
> Mr. Jackson, [sic] has a significant prior history including but not limited to a lumbar fracture with surgery in 1989, spinal fusion in 1991, clavicectomy in 1994, an assualt [sic] and stabbing incident in November of 2001 and two subsequent losses in November of 2004. One which appears to involve a neck fracture and the second a workers compensation loss. Mr. Jackson did not seek any treatment after our loss until the next day. I did include his chiropractic treatment through 05/30/2001 when he states he is quite a bit better and released from care. He then starts treating for headaches. Mr. Jackson, [sic] did not strike his head in this loss nor did he have any loss of consciounes [sic]. He also has a prior history of headaches that dates back at least 15 years. I did not consider the anterior discectomy as caused by this loss. All diagnostics show sever [sic] degenertive [sic] discs disease. Mr. Jackson has already received $55,000.00 for this loss.
>
> If you have information to the contrary or additional information that we have not considered, please forward to my attention and we will review and advise.

(Hugill Aff. Exs. A26, A29 (with enclosures)).

49. As recorded on November 14, 2008, Perez received further correspondence from O'Donnell including O'Donnell's demand that Perez clarify her evaluation of Jackson's UIM claim. Perez felt that she had adequately explained to O'Donnell her decision and evaluation. Perez nonetheless telephoned O'Donnell, received his voice mail, and again left O'Donnell a detailed message. (Hugill Aff. Ex. A26).

50. More than six months later, on June 2, 2009, Allstate employee Laurie Myers ("Myers"), in reviewing the file, noted that Jackson's UIM claim had been evaluated during the

summer of 2008 and that Perez had informed O'Donnell of Allstate's conclusions in personal,

direct conversations with O'Donnell as well as in three letters, all stating that Jackson was, in

Allstate's view, fully compensated by the $50,000 payment from Martin's insurer and the

additional $5,000 Med Pay from Allstate.  Since it had been eleven months since the first denial of

compensation under the UIM coverage and seven months since the last contact with the insured's

attorney, Myers closed the file.  (Hugill Aff. Ex. A26).

51.  On August 21, 2009, Jackson filed the instant lawsuit against Allstate seeking damages

for Allstate's breach of contract and bad faith, which cause of action was timely removed to this

Court.  (Notice of Removal; State Court Complaint).

### III.  Discussion of Applicable Law

Indiana law recognizes a legal duty, implied in all insurance contracts, requiring the insurer

to deal in good faith with its insured.  *Erie Ins. Co. v. Hickman by Smith,* 622 N.E.2d 515, 520 (Ind.

1993).  The evidentiary standard is high for establishing bad faith under Indiana law on the part of

an insurer:  "[A] good faith dispute about the amount of a valid claim or about whether the insured

has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the

obligation to exercise good faith.  This is so even if it is ultimately determined that the insurer

breached its contract."  *Erie,* 622 N.E.2d at 520 (emphasis added); *accord, McLaughlin v. State

Farm Mut. Auto. Ins. Co.,* 30 F.3d 861, 867-68 (7th Cir. 1994)(applying *Erie v. Hickman* and

reversing award of punitive damages for bad faith denial of coverage).  Moreover, the lack of a

diligent investigation by the insurer is not, without more, a breach of the duty of good faith dealing.

*Erie*, 622 N.E.2d at 520.  An insurance company has a duty in the ordinary course of business to

investigate and evaluate claims made by its insureds. *Burr v. United Farm Bureau Mut. Ins. Co.,* 560 N.E.2d 1250, 1255 (Ind.Ct.App. 1990); *Thompson ex rel. Thompson v. Owensby,* 704 N.E.2d 134 (Ind.Ct.App. 1998). To prove bad faith, a plaintiff must establish, by clear and convincing evidence, that the insurer had knowledge at the time of its determination that there was no legitimate basis for the position it was taking. *Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers Mut. Ins. Co.,* 779 N.E.2d 21, 29 (Ind.Ct.App. 2002). Indiana case law is replete with reminders of the kind of conduct by the insurer that does and does not constitute bad faith: "Poor judgment and negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Hoosier Ins. Co. v. Audiology Foundation of America,* 745 N.E.2d 300, 310 (Ind.Ct.App. 2001). "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley v. Indiana Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind.Ct.App. 1998). A bad faith determination inherently includes and requires an element of culpability. "[P]oor judgment or negligence do not amount to bad faith since the 'additional element of conscious wrongdoing must also be present.'" *Heritage Mut. Ins. Co. v. Advanced Polymer Tech., Inc.,* 97 F.Supp.2d 913, 936 (S.D. Ind. 2000), *quoting, Colley,* 691 N.E.2d at 1261. The obligation of good faith and fair dealing includes the obligation to refrain from: (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim. *Erie,* 622 N.E.2d at 519; *see also, Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37, 40 (Ind. 2002)(finding that an insurance company did not act in bad faith in refusing to defend its insured based on its interpretation of contract provision, even though that denial might have been erroneous); *Thompson Hardwoods, Inc. v. Transportation Ins. Co.,* 2002 WL 440222

(S.D. Ind. 2002)(summary judgment in favor of insurer on bad faith claim; applying *Erie v. Hickman* and determining that the predominant issue in bad faith setting is whether insurer had "rational, principled basis" for its actions at the time of the claimed improper acts, not whether those actions were correct in hindsight); *Masonic Temple,* 779 N.E.2d at 29 (under Indiana law an insurer avoids liability for acting in bad faith when its claims handling decisions were made in good faith and upon a rational basis).

Incorporating these well established common law principles for evaluating insurance company conduct, the Indiana General Assembly enacted I.C. 27-4-1-4.5, which provides:

### Enumeration of unfair claim settlement practices

\* \* \* \* \*

(2)  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

\* \* \* \* \*

(4)  Refusing to pay claims without conducting a reasonable investigation based upon all available information.

\* \* \* \* \*

(6)  Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

(7)  Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

\* \* \* \* \*

(14)  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

With these principles well in mind, we turn to examine the uncontroverted material facts presented here to determine whether they are resolvable as a matter of law.

# IV.  Analysis

Plaintiff alleges that Defendant breached its duty of good faith to Plaintiff in the following ways by --

    (1)      failing to pay or otherwise act on Plaintiff's claim for UIM benefits;

    (2)      failing to forward the adjuster's evaluation of the claim to an "Evaluation Consultant";

    (3)      delaying any decision for more than one year following the date of the original request for payment; and

    (4)      failing to properly articulate the reason for its denial of Plaintiff's claim, in violation of I.C. 27-4-1-4.5.

## (1)  The failure to act on the claim:

Plaintiff alleges that Defendant has still never specifically denied his claim.  This assertion, however, is belied by a clear and uncontroverted evidence establishing that Defendant did, in fact, deny Plaintiff's claim as communicated in the numerous letters and other communications to Plaintiff's counsel.  Specifically, the July 14, 2008, and August 1, 2008, letters leave no doubt that Defendant had decided to pay nothing more with respect to Jackson's claim.  (*See* Findings of Fact 46, 48).  Even if these letters left the decision by Allstate in doubt, its failure to send a more explicit letter of denial would amount to nothing more than mere negligence.   No reasonable jury could infer from the evidence in this case, including the two referenced letters, that Allstate intended to deceive Jackson or his attorney  about whether his claim was denied.  Thus, there is no basis on which Plaintiff could prevail on his bad faith claim and summary judgment must enter.

## (2)  The failure to have the adjuster's decision reviewed by an "Evaluation Consultant"

Exhibit 30 makes reference to the transmittal of Plaintiff's claim and file to an Allstate employee or agent designated as an "Evaluation Consultant." However, there is no indication in the record that any evaluation or report was produced thereafter based on that analysis or that any such analysis influenced Defendant's denial decision. Nonetheless, Plaintiff cites no regulation or statute requiring that an evaluation consultant render an opinion before a final decision to deny the claim can be made by the insurer. The insurer has no duty to seek further consultation under the Indiana statute or under common law, and thus its failure to do so does not constitute negligence, nor is it evidence of bad faith.

**(3)  The insurer's delay in either paying or denying the claim for more than one year:**

Plaintiff's first formal demand for payment was made on June 27, 2007. (Finding of Fact 24). The claim was denied, at the earliest, July 14, 2008, or arguably August 1, 2008. (Findings of Fact 46, 48). An insurer may be found liable for its bad faith by "*causing* an unfounded delay in payment." *Erie,* 622 N.E.2d at 519. Despite the periods of delay in evidence here, nothing adduced indicates that Defendant "caused" the delay (see findings of fact 24-46, *supra*). The delay in obtaining medical records was not attributable to Defendant under any theory of fault. The fault of this delay clearly lies at the feet of Plaintiff and Plaintiff's counsel. In addition, there is no showing that Defendant failed to promptly respond to counsel's inquiries concerning any matter or that it significantly delayed obtaining information with the intention, design and purpose of delaying the resolution of the claim. Lacking such evidence, Plaintiff cannot successfully establish the insurer's bad faith, in this regard and, again, summary judgment is appropriate.

**(4)  Defendant's alleged failure to articulate the reason for or basis of its denial
of the claim:**

Under I.C. 27-4-1-4.5, the failure to promptly provide a reasonable explanation based on provisions in the insurance policy, given the facts or applicable law of the case and the reason for denial of a claim can amount to an unfair claim settlement practice. Here, the uncontroverted evidence discloses that Defendant's adjuster failed to cite to specific provisions of the Policy in her letters to Plaintiff's counsel in which she denied Jackson's claim. Finding of Fact 46 references Allstate's letter of July 14, 2008, which states that, "[I]t is our opinion that Mr. Jackson has been fairly compensated for the injuries sustained in this accident by the $55,000.00 he has already received." Even assuming the better practice would have been for the adjuster to cite the specific provisions of the Policy to which her conclusions were tied, the gist of those letters nonetheless clearly references the "legally entitled to recover" provision found in the Policy as the grounds for denial. (*See* Finding of Fact 1). The communication from Allstate's adjuster, despite its deficiencies, provides a "reasonable explanation" of the Policy basis for the denial of Jackson's claim as required under the Indiana statutes. In any event, there is no support under any reasonable interpretation of this evidence for a finding of bad faith on the part of the insurer.

## V. Conclusion

The only issue remaining for resolution before this Court is Plaintiff's breach of contract claim, which we do not address here and ultimately may require a jury determination.

Having concluded that the evidence does not support a finding of bad faith on the part of Defendant, we need not address any claim for punitive damages against the insured. The issue of whether Defendant breached its contract by failing to pay additional amounts to Plaintiff under his Policy will be resolved by a trial by jury hereby set for three days beginning

on Monday, May 23, 2011, at 9:30 a.m., in Room 200 of the United States Courthouse in New

Albany, Indiana. A final pretrial conference shall occur on Tuesday, May 10, 2011, at 2:00 p.m.

in Judge Barker's chambers (room number to be announced at a later date) in the

United States Courthouse in Indianapolis, Indiana, at which all counsel and their clients must

attend in person. **Please note the Indianapolis location of the pre-trial conference.**

     In view of the Expense and Delay Reduction Plan adopted by this District to implement

the Civil Justice Reform Act, no continuances of this date are anticipated, absent extraordinary

circumstances.

     **SO ORDERED.**

**Dated:** 1/28/2011

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Electronic copies to:**

Thomas David Collignon
COLLIGNON & DIETRICK PC
tcollignon@cdattorneys.com

Patrick Joseph Dietrick
COLLIGNON & DIETRICK
pdietrick@cdattorneys.com

Michael B. Knight
COLLIGNON & DIETRICK, PC
mknight@cdattorneys.com

Harry B. O'Donnell IV
hodIV@aol.com